875 F.2d 1271
 RICO Bus.Disp.Guide 7213
 ASHLAND OIL, INC., a Kentucky corporation, Bell Fuels, Inc.,
a Nevada corporation, Jasper County Farm Bureau Cooperative
Association, Inc., an Indiana corporation, Marathon
Petroleum Company, an Ohio corporation,
Plaintiffs-Appellants/Cross-Appellees,
v.
Toy Rex ARNETT, Jr., Thomas R. Arnett, and Donald G.
Richards, Defendants-Appellees/Cross-Appellants,
and
Rena Arnett, Super Payless Gas, Inc., Charles Arnett, Norma
Arnett, William Shireman, Steel City Gas Stop, Inc., Carson
Truck Plaza, Inc., Kenneth Ford, Carson Petroleum Company,
Interstate Truck Plazas of America, Inc., and Richards,
Isenberg & Co., Inc., Defendants-Appellees.
 Nos. 87-2139, 87-2140 and 87-2198.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 13, 1988.
Decided May 16, 1989.
 
 Melbourne A. Noel, Jr., Brad A. Levin, Laser, Schostok, Kolman and Frank, Chicago, Ill., for plaintiffs-appellants/cross-appellees.
 Karen L. Hughes, Lucas Holcomb & Medrea, Merrillville, Ind., Alan S. Brown, Locke Reynolds Boyd & Weisell, Indianapolis, Ind., Roger J. McFadden and Thomas J. Dillon, Schuyler, Roche & Zwirner, Chicago, Ill., for appellees.
 Before MANION and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 This case involves an appeal and cross-appeals from a judgment entered following a jury trial. The plaintiffs, four oil suppliers, alleged that Toy and Thomas Arnett orchestrated two episodes of fraud, executed through a petroleum wholesale corporation owned by them, named Arnett Oil, Inc. According to the plaintiffs, the two Arnetts, in league with Arnett Oil's accountant, Donald G. Richards, induced three of the plaintiffs to extend or expand Arnett Oil's credit by mailing them a false financial statement showing Arnett Oil to be in sound financial condition, when in fact it was not. The plaintiffs also alleged that the Arnetts, beginning approximately ten months after sending out the false financial statement, picked up unusually large quantities of petroleum product from the plaintiffs' sales terminals without intending to pay. The plaintiffs argued that the frauds were a part of the Arnett brothers' scheme to "bust out" Arnett Oil; that is, to expand the company's assets at the expense of the plaintiffs, and then to funnel those assets or their proceeds to themselves through intermediary companies also owned or controlled by them or their relatives. As a result, Arnett Oil would become unable to pay the plaintiffs for their product.
 
 
 2
 The plaintiffs contended that the defendants (including a number of defendants exonerated by the jury and not before us) had violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1961, et seq., as amended. The plaintiffs alleged that the Arnetts and Mr. Richards conducted the affairs of Arnett Oil through two patterns of racketeering activity in violation of Sec. 1962(c). They alleged that the credit fraud involved predicate acts of mail and wire fraud which constituted one pattern of racketeering activity within the meaning of Sec. 1961(5), and that predicate acts of mail, wire, andbankruptcy fraud, and arson, committed during the product theft episode formed another. They also alleged that Mr. Richards' preparation of Arnett Oil's financial statement was common law fraud.
 
 
 3
 The district court submitted to the jury detailed interrogatories based on each of the plaintiffs' RICO and fraud counts. The plaintiffs were unsuccessful in persuading the jury that the defendants had used or invested the proceeds derived from racketeering activity in five defendant companies owned or controlled by the Arnetts (Counts III, IV, VI, VII, and VIII). 18 U.S.C. Sec. 1962(a). These counts are not involved in this appeal. The jury also found that Arnett Oil's "trucking arm," Super Payless Gas, Inc., (Super Payless) did not violate Sec. 1962(d) by conspiring to violate Sec. 1962(c).
 
 
 4
 The jury did find, however, that Toy and Thomas Arnett had participated in or conducted the affairs of Arnett Oil through the two patterns of racketeering activity, in violation of 18 U.S.C. Sec. 1962(c) (Counts I and II). The district court entered judgment (after trebling the actual damages found by the jury) against Toy and Thomas Arnett in favor of plaintiffs Marathon Petroleum Company (Marathon) for $1,062,249.00, Jasper County Farm Bureau Cooperative Association, Inc. (Jasper) for $1,577,145.00, Bell Fuels, Inc. for $286,623.00, and Ashland Oil, Inc. (Ashland) for $1,647,027.00.
 
 
 5
 The district court granted a directed verdict on the fraud claim (Count X) against all plaintiffs in favor of Richards & Company (Mr. Richards' accounting firm), and against Marathon in favor of Mr. Richards. Jasper voluntarily dismissed its fraud claim during trial. The jury found in favor of the remaining two plaintiffs, Ashland and Bell Fuels, and against Mr. Richards. The court entered judgment accordingly, awarding $75,000 in damages to Bell Fuels, and $100,000 to Ashland.[1]
 
 I. THE FACTS
 
 6
 The four plaintiffs supplied petroleum products to Arnett Oil, a wholesale dealer headquartered in Remington, Indiana. Arnett Oil resold to a network of service stations, truck stops and other oil-related businesses, some controlled or run by the Arnett family and its business associates. Arnett Oil began as the sole proprietorship of Toy Arnett, and was incorporated in 1978. In late 1979 Thomas Arnett became general manager, and Toy Arnett moved to Florida, but remained president and controlling shareholder.
 
 A. The Credit Fraud
 
 7
 The gist of the facts alleged in Count I was that the Arnett brothers fraudulently schemed to induce Ashland, Marathon and Bell Fuels to extend credit to Arnett Oil beyond the level justified by its financial condition.
 
 
 8
 Arnett Oil often purchased on credit. To establish or maintain a credit account with Ashland, Bell Fuels and Marathon, Arnett Oil periodically sent each company financial compilations. Arnett Oil commissioned monthly and year-end compilations from defendant Richards, a certified public accountant.
 
 
 9
 On June 7, 1982, Ashland cancelled Arnett Oil's credit based upon a February, 1982 financial statement which showed Arnett Oil in very poor financial condition. Mr. Richards produced a March, 1982 statement which inflated Arnett Oil's accounts receivable by $400,000 and its inventory by $75,000. This statement was mailed to Ashland, Bell Fuels and Marathon. (Neither the Arnetts nor Mr. Richards challenges the sufficiency of proof of the statement's falsity.)
 
 
 10
 Relying solely on the "special accrual" statement, Marathon increased Arnett Oil's credit limit from $100,000 to $185,000.
 
 
 11
 After receiving the March, 1982 financial compilation, Bell Fuels' credit manager first called Mr. Richards to clarify its contents. Relying on the compilation and what it considered to be Mr. Richard's assurance of the statement's accuracy, Bell Fuels opened a credit account for Arnett Oil of $75,000.
 
 
 12
 Mr. Richards also responded to telephone and written inquiries from Ashland's credit manager in Columbus, Ohio concerning the "special accrual" statement. Ashland subsequently re-established Arnett Oil's previously cancelled credit, setting a $100,000 limit.
 
 B. The Product Theft
 
 13
 Count II alleged a scheme by which Arnett Oil would get large quantities of plaintiffs' product without paying or intending to pay for it, and then would divert the product or its proceeds to the Arnett brothers' benefit. The crux of the scheme was to take fuel from the plaintiffs' automatic petroleum terminals rapidly enough to obtain huge amounts of fuel before their billing mechanisms could catch up and terminate Arnett Oil's credit.
 
 
 14
 Ashland and Marathon used Marathon's automated terminal facility in Hammond, Indiana to deliver fuel to their wholesale customers, such as Arnett Oil. The wholesaler, by using coded cards, could pick up supplies of petroleum products 24 hours a day, seven days a week, without immediate payment. A computer at the terminal would transmit the data to Marathon's Findlay, Ohio office, which, if appropriate, would relay the information to Ashland's office in Kentucky. Because it could take up to three and a half days for Ashland and Marathon's credit departments to learn of a customer's pick-up, it was possible for a customer to "lift" fuel in excess of its credit limit before access to the terminal could be cut off.
 
 
 15
 Jasper, headquartered in Rensselaer, Indiana, sold through the Indiana Farm Bureau Cooperative in Peru, Indiana, which was open six days a week, twenty-four hours a day. Jasper provided release numbers to customers, allowing them to pick up fuel.
 
 
 16
 Bell Fuels used the Mobil Oil terminal in Hammond, Indiana, and employed an honor system allowing customers to pick up fuel without first paying for it or getting the seller's authorization.
 
 
 17
 Beginning April 21, 1983, Arnett Oil took substantial amounts of petroleum product from Marathon's Hammond terminal, making "lifts" around the clock. During four and a half days, Arnett Oil took product worth over twice its credit limit with Marathon. Because the period ran over a weekend, Marathon's credit department did not learn that Arnett had exceeded its credit limit until Tuesday morning, April 27. After failing to receive the money which Arnett Oil had told Marathon that they would wire, Marathon locked Arnett out of its terminal on April 28, 1983. Arnett Oil now owed Marathon $354,083.28.
 
 
 18
 When Arnett Oil was locked out of Marathon's terminal on April 28, it began taking petroleum product unusually rapidly from Bell Fuels. That day, Tom Arnett from his Remington, Indiana office called Paul Davenport, Bell Fuels' Chief Credit Officer in Chicago, telling him (falsely) that Arnett Oil had a profitable average year, and that he would send Mr. Davenport a new financial statement of Arnett Oil within the next ten days which would be comparable to the figures on the statement Bell Fuels already had. On the basis of this conversation, Bell Fuels authorized Arnett Oil to pick up ten loads of fuel. Arnett Oil became indebted to Bell Fuels for $170,541.86.
 
 
 19
 From April 27 until May 5, 1983, again hauling loads twenty-four hours a day, Arnett Oil took more than $600,000 of fuel from Ashland, exceeding its $100,000 credit limit six times over. It never paid for any of the fuel it picked up during this "run"; by June 1, 1983, Arnett Oil owed Ashland $649,009.03.
 
 
 20
 From May 9 through May 12, Arnett Oil picked up fuel from Jasper, resulting in a balance due of $525,708.38, over five times its credit limit of $100,000. Arnett Oil paid approximately $50,900.00 of this balance on May 15, 1983, but no further payment was made.
 
 
 21
 The plaintiffs introduced evidence that Arnett Oil lost $1,700,000 during the three months after March 31, 1983, implying a massive diversion of funds. As a specific instance of a diversion, the plaintiffs pointed to a wire transfer of $350,000 made on April 28, 1983 from Arnett Oil's bank account in Indiana to a bank account of Arnett Oil of Florida, a separate entity controlled by the Arnetts. Toy Arnett drew out approximately $178,000 of this money in checks which he then cashed. Toy Arnett testified that he considered this amount to be a loan from Arnett Oil. Arnett Oil, which was having "cash flow problems" at the time, financed the $350,000 wire by using a line of credit personally guaranteed by Toy and Thomas Arnett, and their wives. Within ten days (a time when Arnett Oil was not paying its suppliers), Arnett Oil had paid back $280,000 on the line of credit, considerably reducing the Arnetts' personal exposure.
 
 
 22
 Ashland, Bell Fuels and Jasper filed a petition placing Arnett Oil in involuntary bankruptcy in June, 1983. Marathon joined in the proceeding sometime after the initial hearing. There remains some disagreement over the amount of assets the bankruptcy trustee could locate; even accepting the figures claimed by the Arnetts, at the time of trial the bankrupt estate had about $170,000 in assets, while claims totaled almost $2,000,000. The trustee was also unable to locate any inventory or physical assets of any type belonging to Arnett Oil, apparently including petroleum product. Any equipment used in Arnett Oil's operations apparently all belonged to Super Payless.
 
 II. RICO CLAIMS
 
 23
 The Arnett brothers appeal from the judgment entered against them, claiming the court should have granted their motion for judgment n.o.v. because: (1) the evidence failed to establish the "pattern of racketeering activity" required by RICO; (2) the plaintiffs lacked standing to bring a RICO action; and (3) Arnett Oil is not a proper "enterprise" under Sec. 1962(c) of RICO.
 
 A. Pattern of Racketeering Activity
 
 24
 As we have noted, the plaintiffs alleged two episodes of fraud--the credit fraud and the product theft.
 
 
 25
 Although the plaintiffs claim the credit fraud and product theft were both part of the "bust out" scheme, they somewhat inconsistently have characterized them as separate patterns of racketeering activity: the plaintiffs plead them in two counts and have constantly maintained that they were independent patterns of racketeering activity, not a single pattern of which each scheme was an element. The credit fraud and product theft accordingly were separated in the jury's special interrogatories. The jury found that each episode was sufficient to form a pattern, and made a single award of damages based on its findings.
 
 
 26
 Count I alleged predicate RICO offenses of mail and wire fraud. The mailings of the "special accrual statement" and the interstate phone calls between Mr. Richards and Ashland and Bell Fuels were alleged to be in furtherance of the scheme to fraudulently induce Ashland, Bell Fuels and Marathon to grant or expand Arnett Oil's credit.
 
 
 27
 The plaintiffs did not clearly demonstrate how much the fraudulent obtaining of credit in 1982 facilitated the product theft months later in 1983. Doubtless Arnett Oil had to have some kind of credit standing to obtain access to the terminals. But, since we find the evidence as to the product theft (Count II) sufficient to support the verdict, as explained below, we need not be concerned with the nexus between the credit fraud and the product theft.
 
 
 28
 Count II alleged RICO predicate offenses of mail and wire fraud, bankruptcy fraud and arson. The mail and wire fraud offenses involved interstate phone calls between Arnett Oil, and Bell Fuels and Ashland, (requesting further credit from the former and stalling payment of debt to the latter), possibly the numerous wire communications and mailings generated during the billing process, and the $350,000 wire transfer of Arnett Oil assets to Florida. The bankruptcy fraud involved the failure to accurately account for this $350,000 on its Statement of Affairs filed with the bankruptcy court, and Toy and Thomas Arnetts' recognition of a false claim for Carson Petroleum Company against Arnett Oil's estate. The arson concerned the burning of Arnett Oil's records immediately before the bankruptcy trustee requested them, while the records were being transported in Charles and Norma Arnett's (Toy and Thomas' brother and sister-in-law) trailer.[2]
 
 
 29
 Appellants argue that the evidence was insufficient to sustain the jury's finding of a pattern of racketeering activity.
 
 
 30
 A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. Sec. 1961(5). "Racketeering activity," in turn, includes any act or threat "chargeable" under certain state laws (including arson), and any act "indictable" under a number of enumerated federal criminal statutes (including wire and mail fraud, and bankruptcy fraud). 18 U.S.C. Sec. 1961(1).
 
 
 31
 Prior to 1985, little attention was paid to the meaning of pattern, a pattern often being found without discussion when there was proof of any two acts of racketeering activity. See, e.g., United States v. Weatherspoon, 581 F.2d 595, 601-02 (7th Cir.1978).
 
 
 32
 In 1985, however, the Supreme Court commented on the pattern requirement in Sedima, S.P.R.L. v. Imrex Co., blaming the "extraordinary" uses of civil RICO partly on "the failure of Congress and the courts to develop a meaningful concept of 'pattern.' " 473 U.S. 479, 499-500, 105 S.Ct. 3275, 3286-87, 87 L.Ed.2d 346 (1985).
 
 
 33
 In its now-famous footnote 14, the Court in Sedima provided guidance in tackling further definition of a pattern. The Court noted that while a pattern requires at least two acts of racketeering activity, it does not mean any two such acts: "[i]ndeed, in common parlance two of anything do not generally form a 'pattern.' " Id. at 496 fn. 14, 105 S.Ct. at 3285 n. 14. The Court stated that "[t]he target of [RICO] is ... not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." Id., (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)) (emphasis added by Court). The Court found additional direction in another provision of the bill containing RICO which defined a pattern as conduct embracing "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. Sec. 3575(e) (1984) (later repealed).
 
 
 34
 Since Sedima, the pattern of racketeering activity question has appeared in an extraordinary number of cases. This Court alone has considered the issue no less than sixteen times,[3] and the Supreme Court currently has pending thirteen petitions for review on the question (March 21, 1989 U.S.L.W. Topical Index) and has granted review and heard argument in a fourteenth. H.J. v. Northwestern Bell Telephone Co., 829 F.2d 648 (8th Cir.1987), cert. granted, --- U.S. ----, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988).
 
 
 35
 This Circuit has attempted to navigate a middle course between requiring proof of multiple, independent criminal schemes[4] and minimizing any requirement in addition to two predicate acts.[5] We have focused on the dual notions of "continuity and relationship" emphasized in Sedima. See Morgan v. Bank of Waukegan, 804 F.2d 970, 975-77 (7th Cir.1986). In Morgan, we recognized the tension between the two concepts:
 
 
 36
 Requiring both continuity and relationship among the predicate acts for the pattern requirement to be met is a sound theoretical concept that is not easily accomplished in practice. This is because the terms "continuity" and "relationship" are somewhat at odds with one another. Relationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct. Continuity, on the other hand, would embrace predicate acts occurring at different points in time or involving different victims. To focus excessively on either continuity or relationship alone effectively negates the remaining prong.
 
 
 37
 804 F.2d at 975.
 
 
 38
 While defining the proper degree of relationship in a pattern has not caused courts great difficulty, this Court has continued to struggle with the proper application of the continuity branch, which probably cannot be defined more precisely than it was in Morgan:
 
 
 39
 In order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, i.e., "transactions 'somewhat separated in time and place.' " Graham v. Slaughter, 624 F.Supp. 222, 225 (N.D.Ill.1985) (quoting United States v. Moeller, 402 F.Supp. 49, 57-58 (D.Conn.1975)). [Citations omitted.] Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.
 
 
 40
 804 F.2d at 976. See also Deppe, 863 F.2d at 1366; Brandt, 854 F.2d at 952; Liquid Air v. Rogers, 834 F.2d 1297, 1304 (7th Cir.1987), petition for cert. filed, 56 U.S.L.W. 3531 (U.S. Jan. 28, 1988) (No. 87-1262). "The doctrinal requirement of a pattern of racketeering activity is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative." Morgan, 804 F.2d at 976. Subsequent cases have borne this out. Neither the presence of a single scheme[6] nor a single victim[7] has precluded the finding of a pattern of racketeering activity. (Although we have held that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." Tellis v. U.S. Fidelity & Guar. Co., 826 F.2d 477, 478 (7th Cir.1986) vacated and remanded on other grounds, 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 755 (1987).) Despite a degree of amorphism, the multi-factor test in Morgan has found approval in recent commentary. See Ethan M. Posner, Note, Clarifying a "Pattern" of Confusion: A Multi-Factor Approach to Civil RICO's Pattern Requirement, 86 Mich.L.Rev. 1745, 1775-79 (1988); Michael Goldsmith, RICO and "Pattern:" The Search for "Continuity Plus Relationship," 73 Cornell L.Rev. 971, 982 (1988); Lisa A. Huestis, RICO: The Meaning of "Pattern" Since Sedima, 54 Brooklyn L.Rev. 621, 633 (1988). Until the Supreme Court or Congress provides further guidance, the best approach remains a careful fact-specific scrutiny of each case in light of the relevant factors, this court's precedent, and the purposes underlying RICO.
 
 
 41
 The plaintiffs claim that the evidence in Count II was sufficient under Morgan because it involved "literally hundreds of predicate acts" of mail and wire fraud, plus arson and bankruptcy fraud, and because four victims were injured over a period of time.
 
 
 42
 The plaintiffs are mistaken to emphasize the raw number of mail and wire fraud violations. Some of the present uncertainty over the pattern element stems from such arguments which depend upon the unusual nature of these two most commonly alleged RICO predicate acts.
 
 
 43
 RICO includes as "racketeering activity" any act indictable under the mail and wire fraud statutes.[8] 18 U.S.C. Sec. 1961(1)(B). In mail and wire fraud, each mailing or interstate communication is a separate indictable offense, even if each relates to the same scheme to defraud, and even if the defendant did not control the number of mailings or communications. United States v. Aldridge, 484 F.2d 655, 660 (7th Cir.1973). See Badders v. United States, 240 U.S. 391, 393, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). Thus, the number of offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance. While we have encouraged prosecutors to be restrained in the number of mail or wire fraud counts charged relating to a single scheme to defraud, United States v. Joyce, 499 F.2d 9, 25 (7th Cir.1974) (Swygert, C.J., concurring in relevant part, joined by the Court), each mailing or wire communication remains a separate offense. United States v. Zeidman, 540 F.2d 314, 317 (7th Cir.1976).
 
 
 44
 Because of this peculiarity, when the crimes of mail and wire fraud are alleged as RICO predicate acts, any fraud which generates mailings or wire communications involves as many acts of "racketeering activity" as mailings or communications which further the scheme. This encourages bootstrapping ordinary civil fraud cases into RICO suits. Consider, for example, Lipin Enterprises Inc., above, where we affirmed the dismissal of an action alleging that the fraudulent sale (involving twelve mailings) of a company and its wholly-owned subsidiary to a single buyer was a RICO violation. 803 F.2d at 323. Despite the existence of many predicate acts, we held that the defendants' actions lacked the "threat of continuing activity" necessary for a RICO violation. Id. at 324 (quoting Sen.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). See also SK Hand Tool Corp., 852 F.2d at 940-43 (seller's misrepresentation of sold company's true financial condition not a "pattern," despite multiple mailings and wire communications). Likewise, the finding of a pattern formed by multiple mail and wire fraud violations was sustained in Liquid Air only because "each [predicate] act resulted in a distinct injury," which demonstrated the necessary continuity. 834 F.2d at 1297.
 
 
 45
 A review of our post-Sedima cases shows that the raw number of predicate acts has never been determinative, especially when only mail and wire fraud are alleged.
 
 
 46
 Mail fraud and wire fraud are perhaps unique among the various sorts of "racketeering activity" possible under RICO in that the existence of a multiplicity of predicate acts ... may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate into a 'pattern' of racketeering activity.
 
 
 47
 Lipin Enterprises Inc., 803 F.2d at 325 (Cudahy J., concurring). Accord, Elliot v. Chicago Motor Club Ins., 809 F.2d 347, 350 (7th Cir.1986).
 
 
 48
 Nevertheless, we conclude the evidence in this case is sufficient to support the jury's finding of a pattern of racketeering activity.
 
 
 49
 The defendants' actions harmed four different victims. The number of victims is an important consideration; only twice has this court found an absence of a pattern when multiple victims were injured by a defendant's acts, and in both of those cases the several injuries flowed from the same acts. Jones, 845 F.2d at 758; Elliot, 809 F.2d at 350. Here, each victim was hurt in the same manner (showing relationship), and the injuries were inflicted through independent sequential actions (showing continuity)--the "separate transactions" required by Morgan. 804 F.2d at 976. Each truckload taken advanced the scheme and caused an injury to one plaintiff. See Liquid Air, 834 F.2d at 1297.
 
 
 50
 Also, the product theft involved a variety of predicate acts: wire fraud, in the interstate phone conversations with oil companies requesting further credit or extensions, and in using wire communications to divert company assets; bankruptcy fraud, in the Arnett brothers' two misrepresentations to the bankruptcy court; and arson, in the destruction of Arnett Oil's records. More than the number of predicate acts, proof that the defendants used several unlawful means of achieving the scheme's goal separates this case from ordinary business fraud cases. We think that although the approximately four months between the start of the product theft and the last proved predicate act--from the start of the runs to the bankruptcy fraud--was not an especially long period of time, it was sufficient, viewed in light of the other evidence of continuity.
 
 
 51
 Characterizing the Count II allegations as a single scheme does not preclude the finding of a pattern. In SK Hand Tool Corp., we noted that it is an exception to the general rule to find a pattern within a single scheme. 852 F.2d at 941 (citing Jones, 845 F.2d at 758-59). However, we have done just that in a number of cases, including this court's most recent decision on the issue, in Deppe, 863 F.2d at 1364-66, and in Morgan, where we said "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." 804 F.2d at 976. See also Horak, 833 F.2d at 1240; Liquid Air, 834 F.2d at 1303-05; Appley, 832 F.2d at 1027-28. But see H.J. Inc., above at n. 4.
 
 
 52
 Therefore, we conclude that the record supports the jury's finding that the product theft scheme, victimizing four companies, lasting over four months, and involving multiple wire fraud offenses, plus bankruptcy fraud and arson, constituted a pattern of racketeering activity.
 
 B. Standing
 
 53
 Section 1964(c) permits any person injured in his or her business or property by reason of a violation of Sec. 1962(c) to recover treble damages. Plaintiffs here seem plainly qualified to sue under Sec. 1964(c). They pleaded, and the jury found, that the Arnett brothers conducted the affairs of Arnett Oil through a pattern of racketeering activity. The fraudulent scheme alleged in Count II involved exploiting the plaintiffs' sales and billing procedures so that Arnett Oil could rapidly obtain unusually large quantities of the plaintiffs' property, and then diverting that fuel or its proceeds, making worthless Arnett Oils' obligations to pay the plaintiffs for the fuel taken. The plaintiffs' injury from such conduct of the enterprise was direct and substantial.
 
 
 54
 The Arnetts argue that the plaintiffs lacked standing to sue. They rely on the fact that in diverting the assets of Arnett Oil, the Arnetts would be violating their fiduciary duties as officers of the corporation. It would follow, they argue, that the trustee in bankruptcy would have the right to sue the Arnetts, and that the plaintiffs would have only the rights of bankruptcy estate creditors.
 
 
 55
 The Arnetts rely on two cases. Koch Refining v. Farmers Union Cent. Exchange, Inc., 831 F.2d 1339 (7th Cir.1987), decided that under Illinois and Indiana law a bankruptcy trustee of a cooperative can bring a cause of action based on an alter ego theory directly against the member-owners of the cooperative. Id. at 1342-43. The court further decided that the plaintiff creditors of the cooperative did not have standing to sue the member-owners directly, where they had not shown that they themselves were injured by the member-owners. Id. at 1354.
 
 
 56
 In Koch Refining, the court noted that creditors' fraud claims under RICO have been found to be assertable only by the trustee, citing Dana Molded Products, Inc. v. Brodner, 58 B.R. 576, 578 (N.D.Ill.1986). 831 F.2d 1343. Dana held that a creditor of a bankrupt corporation lacked standing to bring a RICO claim against the corporate president. The court made it plain, however, that "the predicate acts of racketeering on which plaintiff bases its claim all involve fraudulent transfers of money from [the bankrupt corporation] and the injuries plaintiff asserts are indistinguishable from those suffered by [the bankrupt corporation] itself." 58 B.R. at 579. It appears the predicate acts were bankruptcy frauds perpetrated while the president was operating the corporation as debtor in possession.
 
 
 57
 Here, the plaintiffs have shown injury distinct from that of other creditors. Although a part of the underlying scheme was the diversion of corporate assets (for which the trustee may well have a cause of action against the Arnetts[9]) an essential part of the scheme, on which its success depended, was the fraudulent taking from the plaintiffs of exceptionally large quantities of fuel. We conclude that the facts show an injury to the plaintiffs significantly different from the injuries to creditors in general resulting from the diversion of corporate assets.
 
 C. Enterprise
 
 58
 Next, the Arnetts claim that Arnett Oil was not a sufficiently distinct entity to be considered the enterprise whose affairs they conducted through a pattern of racketeering activity.
 
 
 59
 "Enterprise," defined in Sec. 1961(4), includes corporations. While the enterprise under RICO cannot simply be the person who allegedly conducted his own affairs through a pattern of racketeering activity, United States v. DiCaro, 772 F.2d 1314, 1319 (7th Cir.1985), there need be shown "only some separate and distinct existence for the person and the enterprise." Haroco, Inc. v. American Nat. B. & T. Co. of Chicago, 747 F.2d 384, 402 (7th Cir.1984) aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The evidence showed that Arnett Oil was an incorporated business which employed several people besides the Arnett brothers, which is sufficient to support the conclusion that Arnett Oil and the Arnett brothers were not one and the same. See McCullogh v. Suter, 757 F.2d 142, 144 (7th Cir.1985) (sole proprietorship with several employees is a sufficiently distinct enterprise).
 
 III. SUPER PAYLESS
 
 60
 Defendant Super Payless, Inc., was Arnett Oil's "trucking arm." It transported, in trucks it owned and operated, all the petroleum product Ashland Oil purchased, including that taken during the runs on the plaintiffs' terminals. Super Payless was managed by Thomas Arnett, operated out of the same office as Arnett Oil, and employed basically the same people. Toy and Thomas Arnett each owned 50% of Super Payless, and were its only officers, Toy its President/Treasurer and Thomas its Vice-President/Secretary.
 
 
 61
 The plaintiffs claim that the jury's finding that Super Payless did not conspire to violate RICO is inconsistent with the finding that its officers, the Arnett brothers, did so conspire, and is against the manifest weight of the evidence, so that the trial judge should have granted their motion for new trial on that issue. Since Toy and Thomas Arnett were the sole owners and officers of Super Payless, and since Super Payless transported the fuel under the unusual circumstances of this case, and was chargeable with the knowledge and intent of its officers, it is hard to see how Toy and Thomas conspired but Super Payless did not.
 
 
 62
 Super Payless cites an exception to corporate liability in claims under Sec. 1962(c) of RICO which avoids penalizing a corporation which is an "unwitting conduit" of its employees' RICO violations. D & S Auto Parts, Inc., v. Schwartz, 838 F.2d 964, 967 (7th Cir.1988). The corporation's responsibility depends upon the role it plays in the scheme--victim, prize, instrument or perpetrator. Haroco Inc., 747 F.2d at 401. The exception is narrow, though, and only applies when a RICO claim is brought against the "enterprise" itself. D & S Auto Parts, Inc., 838 F.2d at 966-986; Liquid Air, 834 F.2d at 1306; Haroco Inc., 747 F.2d at 399-402. The plaintiffs in this case alleged that Super Payless conspired with Toy and Thomas Arnett to conduct another enterprise's affairs through a pattern of racketeering activity, not its own. Thus, the concern engendering the exception, that respondeat superior might be used to circumvent Sec. 1962(c)'s requirement that the person conducting the racketeering activities be separate from the enterprise through which those activities are conducted, does not apply here. See Gruber v. Prudential-Bache Securities, Inc., 679 F.Supp. 165, 179 (D.Conn.1987).
 
 
 63
 Super Payless also briefly argues that a corporation cannot be found to conspire with its own officers, citing footnote 7 of Medallion TV Enterprises Inc. v. SelecTV of California, Inc., 627 F.Supp. 1290, 1301 (C.D.Cal.1986), aff'd 833 F.2d 1360, petition for cert. filed 56 U.S.L.W. 3649 (U.S. March 5, 1988) (No. 87-1478).[10] The plaintiffs respond in kind, citing footnote 22 in Haroco Inc., 747 F.2d at 403, where this court distinguished the Supreme Court's disapproval of antitrust intracorporate conspiracies in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) from conspiracies alleged under RICO. In Haroco Inc., we noted that Copperweld Corp., at least in an alleged conspiracy between a parent corporation and its wholly-owned subsidiary, "does not extend to RICO's provisions in 18 U.S.C. Sec. 1962(c) primarily because the Sherman Act is premised, as RICO is not, on the basic distinction between concerted and independent action. 747 F.2d at 403 n. 22 (citing Copperweld Corp., 467 U.S. at 769, 104 S.Ct. at 2740). Since a subsidiary and its parent theoretically have a community of interest, a conspiracy "in restraint of trade" between them poses no threat to the goals of antitrust law--protecting competition. In contrast, intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits. Russello v. United States, 464 U.S. 16, 26-28, 104 S.Ct. 296, 302-03, 78 L.Ed.2d 17 (1983); Pandick Inc., above.
 
 
 64
 In light of the great weight of evidence supporting the jury's finding that Toy and Thomas Arnett violated and conspired to violate RICO, and the glaring inconsistency between those findings and the finding that Super Payless did not conspire to violate RICO, we deem it an abuse of discretion to deny the plaintiffs' motion for a new trial on this issue. Accordingly, we reverse and remand in this respect.
 
 IV. THE RICHARDS DEFENDANTS
 A. RICO
 
 65
 The district court granted summary judgment in favor of defendants Mr. Richards and his corporation, Richards, Isenberg & Co., Inc. on the RICO counts (I, II and VIII), based on our holding in Tellis v. U.S. Fidelity and Guarantee Company, 805 F.2d 741 (7th Cir.1986), vacated and remanded, 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 755 (1987), that a two-year statute of limitations applied to RICO. On June 22, 1987 (the day the district court entered its final judgment) the Supreme Court found that RICO, which does not have its own limitations period, was analogous to suits for treble damages under the Clayton Act, and thus is subject to a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 107 S.Ct. 2759, 2764-66, 97 L.Ed.2d 121 (1987).
 
 
 66
 The acts complained of occurred less than four years before suit was filed. Although this court has not yet decided whether Agency Holding applies retroactively, Mr. Richards concedes that it does, agreeing that the summary judgment in his favor should be reversed.[11]
 
 
 67
 Mr. Richards does argue, though, that the reversal should not include Richards, Isenberg & Co., Inc. because it was incorporated after the allegedly wrongful conduct took place, and no showing of successor liability was made. Since the plaintiffs do not point to anything in the record to the contrary, we reverse only as to Mr. Richards.
 
 B. Fraud
 
 68
 All four plaintiffs brought a pendent state claim alleging that Mr. Richards, his company, and the Arnetts committed common law fraud (Count X). Before trial, Count X was voluntarily dismissed by each plaintiff as to each defendant except Mr. Richards and Richards & Company (as Mr. Richards' company was then called). Although the court had already dismissed the RICO claims against Mr. Richards and Richards & Company, it retained pendent jurisdiction over the state law claim. Once a trial court has dismissed the only federal claim against a defendant, it may retain pendent state claims if doing so will promote judicial economy, convenience and fairness to litigants. Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Zepik v. Tidewater Midwest, Inc., 856 F.2d 936, 944-45 (7th Cir.1988). Mr. Richards does not question the judge's decision to retain jurisdiction, and the decision appears to be a proper exercise of his discretion. See Zabkowicz v. West Bend Co., Div. Dart Industries, 789 F.2d 540, 546 (7th Cir.1986).
 
 
 69
 During trial, Jasper voluntarily dismissed its fraud claim against both Mr. Richards and Richards & Company. At the close of the plaintiffs' case, the court granted a directed verdict against all plaintiffs in favor of Richards & Company, and against Marathon in favor of both Mr. Richards and Richards & Company. The jury found in favor of the remaining two plaintiffs, Ashland and Bell Fuels, against Mr. Richards. The court entered judgment accordingly, awarding $75,000 in damages to Bell Fuels, and $100,000 to Ashland.
 
 
 70
 (1) Mr. Richards' Cross-appeal
 
 
 71
 Mr. Richards claims that Count X should have been dismissed prior to trial because the plaintiffs "reneged" on their stated intention to seek a dismissal of that count.
 
 
 72
 On March 9, 1987, the plaintiffs filed a trial brief in compliance with a pre-trial order and included a statement that they wished to "pare-down" their complaint "by seeking stipulations to dismiss the ... common law fraud count." The plaintiffs did not discuss the fraud theory or facts supporting it in their trial brief or any other pretrial submission, nor did Mr. Richards.
 
 
 73
 In the meantime, counsel for Mr. Richards had filed a summary judgment motion claiming that the RICO claims were barred by the statute of limitations. The plaintiffs responded on March 13, 1987, asking the court to reserve ruling on the summary judgment motion, claiming that applying a "discovery rule" on the statute of limitations question would require findings of fact better determined at trial.
 
 
 74
 When the trial court ordered summary judgment in favor of Mr. Richards and Richards & Co. on the first day of trial, March 23, 1987, the plaintiffs' counsel indicated they intended to pursue Count X, their only remaining claim against the Richards defendants. Opposing counsel objected and filed a motion to dismiss Count X. The court reserved ruling on the motion, allowing the plaintiffs to file a supplemental trial brief covering Count X.
 
 
 75
 Mr. Richards argues that the plaintiffs' original trial brief was an "addendum" to the court's "Order With Reference to Conduct of Trial," and that the two together constituted a binding pre-trial order which could be modified "only to prevent manifest injustice." FED.RULE CIV.PRO. 16(e); Erff v. Markhon Industries, Inc., 781 F.2d 613, 617 (7th Cir.1986).
 
 
 76
 A trial court may choose to hold a party to pretrial representations. Knight v. Otis Elevator Co., 596 F.2d 84, 89 (3d Cir.1979); Moore v. Sylvania Electric Products, Inc., 454 F.2d 81, 83-84 (3d Cir.1972). Since the decision to hold parties to a formal pretrial order is within the trial court's broad discretion, Sadowski v. Bombardier Ltd., 539 F.2d 615, 618 (7th Cir.1976), the discretion whether to hold a party to a non-binding trial brief must be broader still. When making that decision, the trial court should consider:
 
 
 77
 (1) the prejudice or surprise in fact of the opposing party;
 
 
 78
 (2) the ability of the opposing party to cure the effects of any prejudice;
 
 
 79
 (3) the disruption of the orderly and efficient trial of the case or of other cases in the court; and
 
 
 80
 (4) the bad faith or willfulness in the party's failure to adhere to its pretrial representation.
 
 
 81
 Smith v. Rowe, 761 F.2d 360, 365 (7th Cir.1985); Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d 1226, 1245 (7th Cir.1982), aff'd on other grounds, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).
 
 
 82
 The fraud claim had appeared in the pleadings for more than a year. Although counsel for Mr. Richards claims he ceased preparation on Count X in reliance on the plaintiffs' representation that they would seek dismissal, only two weeks passed before the plaintiffs revived Count X. The trial then covered four weeks, and included a ten-day recess during the plaintiffs' case. We are unpersuaded by Mr. Richards' claim that he was prejudiced.
 
 
 83
 We also note that the plaintiffs' promise to seek stipulations dismissing Count X was explicitly intended to pare down the complaint to just RICO claims; when the RICO claim against Mr. Richards was dismissed, the situation materially changed. We are unconvinced that the plaintiffs' counsel's actions demonstrated any bad faith. We conclude that the trial judge acted within his discretion in declining to dismiss Count X.
 
 
 84
 (2) Marathon's Appeal
 
 
 85
 At the end of the plaintiffs' case, Chief Judge Sharp granted Mr. Richards' motion for directed verdict against Marathon, but denied it as to Ashland and Bell Fuels. He did not state the basis for his ruling. Reviewing the record, it seems fairly clear that he accepted Mr. Richard's argument that Toro Co. v. Krouse, Kern & Co., Inc., 644 F.Supp. 986 (N.D.Ind.1986), aff'd 827 F.2d 155 (7th Cir.1987) required the plaintiffs to show "privity or near-privity" between themselves and Mr. Richards in order to recover for fraud. While there was evidence that Mr. Richards had spoken directly with employees of Ashland and Bell Fuels, such evidence was lacking as to Marathon, so the court granted a directed verdict against the latter. Marathon appeals.
 
 
 86
 Toro was a suit by a third party claiming to have detrimentally relied upon negligently prepared audit reports. 644 F.Supp. at 991. The court held that in accountant negligence actions Indiana would follow the restrictive "privity or near privity" rule of Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), and granted summary judgment against the plaintiff, who had had no contact or contract with the accountants preparing the audit reports.
 
 
 87
 In Ultramares Corp., then Chief Judge Cardozo was concerned with the possibly limitless liability for negligence accountants would face unless their duty of care was restricted to those who employ them. He plainly recognized the distinction between an accountant's duty of care and duty to refrain from fraud:
 
 
 88
 The defendants owed to their employer a duty imposed by law to make their certificate without fraud, and a duty growing out of contract to make it with the care and caution proper to their calling.... To creditors and investors to whom the employer exhibited the certificate, the defendants owed a like duty to make it without fraud, since there was notice in the circumstances of its making that the employer did not intend to keep it himself. [citation omitted] A different question develops when we ask whether they owed a duty to these to make it without negligence.
 
 
 89
 255 N.Y. at 179, 174 N.E. 444 (emphasis added). The court went on to hold that the defendants' duty of care extended only to those with whom they had contractual privity, or a relationship "so close as to approach that of privity." 255 N.Y. at 182-83, 174 N.E. at 446. Toro, which adopted Ultramares Corp., was likewise grounded in accountant negligence, not fraud. Privity, however, is not an element of fraud in Indiana. See, e.g., Parke County v. Ropak, Inc., 526 N.E.2d 732, 736 (Ind.App.1988); Plymale v. Upright, 419 N.E.2d 756, 760 (Ind.App.1981) (collecting cases). To require a showing of privity or near privity would "emancipate accountants from the consequences of fraud," just what Ultramares Corp. explicitly did not do. 255 N.Y. at 189, 174 N.E. 448.
 
 
 90
 Mr. Richards reminds us that we may affirm the district court's decision even though its reasoning was incorrect, if the record discloses a fair basis for doing so. Haroco Inc., 747 F.2d at 399. While Mr. Richards does not challenge the sufficiency of the evidence showing that the statement was false, he claims there was insufficient evidence to find that he made a representation to Marathon, and that Marathon reasonably relied on that representation, if made.
 
 
 91
 There was sufficient evidence to present a jury question on both issues. The cover letter which accompanied the "Special Accrual Statement" plainly shows that Mr. Richards was aware that the statement would be given to Arnett Oil's suppliers:
 
 
 92
 Here are the statements you need to provide your suppliers which shows Arnett Oil, Inc. on the accrual basis. As you know, Arnett Oil, Inc. tax returns are prepared on the cash basis and therefore, the tax return for March 31, 1982 will differ significantly from the attached.
 
 
 93
 While Mr. Richards claimed at trial he was unaware at the time which suppliers would receive the statement, he knew that some would.
 
 
 94
 Mr. Richards also argues that the accountant's disclaimer which accompanied the financial statement sent to Marathon makes any reliance on the accuracy of the statement unreasonable as a matter of law, or in any case that there was no evidence that reliance on such a statement was reasonable.[12] Mr. Richards points out that the "special accrual statement" was merely an unverified compilation of figures provided by Arnett Oil, not an audit, and did not carry an accountant's assurance of accuracy. He claims it could not reasonably be relied upon as accurate. Such a claim is inconsistent with the testimony of employees of Ashland and Bell Fuels that they contacted Mr. Richards directly to confirm the accuracy of the figures in the statement, and with Marathon's theory of Mr. Richards' liability--Marathon did not merely claim that Mr. Richards failed to verify the accuracy of the statement; it claimed, and the jury reasonably found, that Mr. Richards knew that statement was fraudulent and that it would be relied on as accurate. A disclaimer cannot relieve an accountant from the duty to refrain from knowingly being party to fraud.
 
 
 95
 A jury could reasonably find that Marathon's reliance on the statement was justified. While unaudited statements do not carry an accountant's guarantee of accuracy, the plaintiffs' expert accounting witness, Mr. Hatcher, testified that they are governed by generally accepted accounting principles unless stated differently on their face; that an accountant cannot ethically prepare a compilation using figures known to be wrong; and if the accountant later learns the figures used are incorrect, the accountant must notify whoever received the compilation of the inaccuracies. Since a jury could conclude that Marathon was reasonable in its practice of accepting such unaudited compilations when making credit determinations, we decline to uphold the directed verdict against Marathon.
 
 
 96
 We do not accede to Marathon's suggestion that we order entry of judgment in its favor against Mr. Richards based on the jury's findings against him on Ashland and Bell Fuel's fraud claims. The cases are not identical. While we conclude that a jury properly could find that Marathon's reliance on the compilation alone was reasonable, we cannot say as a matter of law that it was. Therefore we reverse and remand for trial on Marathon's fraud claim.
 
 V. CONCLUSION
 
 97
 Insofar as the judgment was in favor of Super Payless and Mr. Richards on the plaintiffs' RICO claims, and was in favor of Mr. Richards on Marathon's fraud claim, it is REVERSED and the cause REMANDED for trial. In all other respects, the judgment is AFFIRMED. The plaintiffs are awarded costs on appeal.
 
 
 
 [1]
 The jury also answered that it found in favor of Ashland and Bell Fuels on their punitive damage claim against Mr. Richards, but fixed the amount at $0
 
 
 [2]
 Arson and "any offense involving fraud connected with a case under title 11" are RICO predicate acts. 18 U.S.C. Sec. 1961(1)(A) and (D). The jury was asked whether the plaintiffs proved "that these acts of mail fraud or wire fraud or arson or bankruptcy fraud as alleged in Count II constituted a pattern of racketeering activity conducted by one or more, if any, of the defendants." As to Charles and Norma Arnett, and Carson Petroleum, the jury answered "no"; as to Toy and Thomas Arnett, they answered "yes." The findings favoring Charles and Norma Arnett and Carson Petroleum do not mean the arson and bankruptcy fraud did not occur. The jury could have decided that the arson occurred, and that the misstatement on the bankruptcy filing was fraudulent, but exonerated Charles and Norma Arnett and Carson Petroleum because they only committed a single predicate act, not a pattern. Likewise, the finding that these defendants had not conspired to violate 18 U.S.C. Sec. 1962(c) could have been based on lack of evidence of an agreement
 
 
 [3]
 See Deppe v. Tripp, 863 F.2d 1356 (7th Cir.1988); Brandt v. Schal Associates, Inc., 854 F.2d 948 (7th Cir.1988); SK Hand Tool Corp. v. Dresser Industries Inc., 852 F.2d 936 (7th Cir.) petition for cert. filed, 57 U.S.L.W. 3237 (Sept. 15, 1988) (No. 88-458); Jones v. Lampe, 845 F.2d 755, 756 fn. 4 (7th Cir.1988) (and cases collected therein); United States v. Horak, 833 F.2d 1235 (7th Cir.1987); Ill. Dept. of Rev. v. Phillips, 771 F.2d 312 (7th Cir.1985) (Phillips); Lipin Enterprises, Inc. v. Lee, 803 F.2d 322 (7th Cir.1986)
 
 
 [4]
 See Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir.1986). The Supreme Court now has under consideration this approach, as applied in H.J. Inc., above
 
 
 [5]
 See, e.g., R.A.G.S. Couture, Inc. v. Hyatt, 774 F.2d 1350 (5th Cir.1985); Cal. Arch. Bldg. Prod. v. Franciscan Ceramics, 818 F.2d 1466, 1469 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 698, 98 L.Ed.2d 650, (1988)
 
 
 [6]
 Deppe, above; Liquid Air, above; Appley v. West, 832 F.2d 1021 (7th Cir.1987); Phillips, above
 
 
 [7]
 Morgan; Phillips; Appley
 
 
 [8]
 The mail fraud statute, 18 U.S.C. Sec. 1341, makes it a crime for any person to use the United States Postal Service for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." The wire fraud statute, 18 U.S.C. Sec. 1343, likewise prohibits the use of "wire, radio, or television communication in interstate or foreign commerce" for the purpose of executing a scheme or artifice to defraud
 
 
 [9]
 Plaintiffs concede they will not be able to maintain claims against Arnett Oil for any amounts which they recover from defendants in this action
 
 
 [10]
 Contrary to the plaintiffs' assertion, the clear weight of authority does not support its position. The district courts are at best about evenly divided, and no other circuit has considered the question. For cases accepting RICO intracorporate conspiracy theories, see Pandick Inc. v. Rooney, 632 F.Supp. 1430, 1435 (N.D.Ill.1986); Callan v. State Chemical Mfg. Co., 584 F.Supp. 619, 623 (C.D.Ill.1984); Saine v. A.I.A., Inc., 582 F.Supp. 1299, 1307 n. 9 (D.Colo.1984); Mauriber v. Shearson/American Exp., Inc., 567 F.Supp. 1231, 1241 (S.D.N.Y.1983). Contra, see Lawaetz v. Bank of Nova Scotia, 653 F.Supp. 1278, 1287 (D.V.I.1987) (collecting cases)
 
 
 [11]
 Since Mr. Richards waives the issue, we do not decide it. We note, however, that other courts have applied Agency Holding retroactively. Lund v. Shearson/Lehman/American Exp., Inc., 852 F.2d 182 (6th Cir.1988); Beneficial Standard Life Ins. v. Madariaga, 851 F.2d 271 (9th Cir.1988); Davis v. A.G. Edwards and Sons, Inc., 823 F.2d 105 (5th Cir.1987); Charter Oak Fire Ins. Co. v. Domberg, No. 83 C 4522, 1987 WL 15413 (N.D.Ill. August 3, 1987) (available on Lexis and Westlaw)
 
 
 [12]
 Mr. Richards does not challenge the jury's implicit finding of the reasonableness of Ashland and Bell Fuels' reliance on the statement and any assurances of its accuracy made by him