**In re RUSTY JONES, INC., Debtor.**

**Bankruptcy No. 88 B 18708.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

July 2, 1992.

Norman Newman, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for debtor.

## OPINION ON PROCEDURES TO RESOLVE DISPUTED WARRANTY CLAIMS

JACK B. SCHMETTERER, Bankruptcy Judge.

### Introduction

The Debtor, Rusty Jones, Inc. ("Rusty Jones"), backed up its rustproofing of autos with warranties to compensate customers in event the rustproofing failed. Over four million warranties were issued between 1976 and July 31, 1988. Approximately 800,000 of these warranties were valid as of December 5, 1988, the day Rusty Jones filed a petition for relief under Chapter 11 of the Bankruptcy Code. There were 257,765 warranty claims filed with the Clerk of this Court prior to the claims bar date set in this proceeding. Many claims are in fixed amounts, ranging from a few hundred dollars to huge amounts. Others, as permitted, filed "To Be Determined" ("TBD") claims to allow for future rust during the long warranty period. The distributors also filed large claims, but those have been resolved. Under the confirmed Plan, all unsecured creditors will share assets net of allowed administrative claims. The issue now before the Court is how to resolve the many warranty claims in a fair and reasonably expeditious manner.

Beatrice Company owned Rusty Jones from 1984 to 1988. It covered its liability under the rustproofing warranties with insurance obtained primarily from the Transit Casualty Company. In December 1985, however, Transit Casualty was placed in liquidation, and Rusty Jones lost its insurance. The business of the debtor declined during the late 1980s as competing rustproofing was increasingly applied to autos by manufacturers and dealers. Rusty Jones was sold in the fall of 1988, and shortly thereafter its Chapter 11 petition was filed.

During the course of these Bankruptcy proceedings, the Court established a claims bar date of December 1, 1989. Of the warranty claims filed, 28,296 of these claims asserted liquidated damages in the total amount of $14,105,009.28. The remaining 229,469 TBD claims were filed with no actual damages stated.[1] To aid in resolution of these warranty claims, the trustee for the Rusty Jones Creditors' Grantor Trust (the "Trustee") retained a statistician, Dr. Albert Madanski, to help estimate the aggregate likely amount of TBD claims. Dr. Madanski projected this amount to total $137,403,000. The total aggregate claims of distributors as well as both liquidated and TBD warranty claims could easily reach into the range of $150,000,000.

On September 28, 1989, a lawsuit entitled *Rusty Jones v. Beatrice Company, Inc., et al.*, No. 89 C 7381 (N.D.Ill.) was filed before the District Court, alleging that Beatrice is liable for most or all of Rusty Jones' debts. Beatrice denies liability. Informal settlement talks were conducted before this Court prior to that suit being filed, and figures discussed by both sides were well below the foregoing projection of total claims in this bankruptcy. This Court is unaware of any serious settlement talks currently underway between the parties. Substantial discovery has occurred and pretrial conferences were held and will be held before the District Court. However, no trial date has been set. A litigation result favoring Rusty Jones could somewhat expand the dividends to warranty claimants

---

1. The actual number of claims will be lower when the Trustee culls out an estimated 4,622 duplicate claims.

by increasing the amount of total money available for distribution, but only after compensating counsel bringing that suit. Those counsel are working on a contingent fee basis.

The assets in Debtor's estate besides this suit comprise $1.4 million in liquid investments. Even if the litigation results in a large recovery, the percent dividend on claims of $150 million will not be great. With only $1.4 million in assets, and warranty claims exceeding $150 million, the payout to the claimants would be less than 1% on all claims before claims objections are considered, even less after additional administrative claims are considered.

Debtor's Fifth Amended Plan of Reorganization was confirmed on March 12, 1990. As part of that Plan, a Trustee was appointed. He is charged, among other duties, with responsibility to recommend a warranty resolution procedure with the advice and consent of the Warranty Claim Committee (which entity has been barely functioning except for its counsel) and the Distributors' Committee. Such procedure will be subject to approval of this Court. At a hearing on this matter, the Trustee recommended postponement of any action until the litigation with Beatrice is concluded. All of the other parties before the Court concurred in that recommendation.

However, this proposal is troublesome. Any warranty claims resolution procedure will be expensive and time consuming. However, availability of the $1.4 million makes it necessary that some procedure be found, even if there is no recovery from Beatrice. Delay until after the warranty claimants are likely to discard all their records will not be fair to them, nor will such delay accomplish any proper purpose. For reasons set forth below, delaying action until recovery (if any) from Beatrice is not warranted.

All interested parties were invited to submit memoranda concerning possible claims resolution procedures. Memoranda were submitted by the Trustee, Beatrice Company, the Distributor Creditors' Committee (the "Committee"), Indiana Lumbermens Mutual Insurance Company, and the Wisconsin Attorney General. This opinion discusses these positions and determines adoption of a procedure for resolving the warranty claims.

### Positions of Interested Parties

■ The Trustee recommends that the Court not evaluate warranty claims until conclusion of the Beatrice litigation. After that litigation is concluded many years from now, he suggests that the Court will then know the amount of funds available to distribute to warranty claimants. Moreover, since rust damage historically occurs five to nine years after a car is rustproofed, the Trustee suggests that the Court should allow TBD claimants to file liquidated claims some years in the future, even though they did not sustain rust damage by the claim bar date.

In addition, the Trustee proposes that claims of TBD claimants be evaluated by a statistical mechanism. Thus, the number of TBD claims should be multiplied from the claims bar date through 1997 (nine years after the last warranty was issued) by the statistical average repair costs for those years. The average claim can thereby be determined, and that average should (he argues) then be allowed. However, he does not demonstrate that the long delay he suggests would affect, help, or refine the statistical analysis.

Counsel for the Warranty Creditors Committee concurs with the Trustee in suggesting that the Court defer evaluation of warranty claims until conclusion of the Beatrice litigation. However, such counsel disagrees with the Trustee's proposal to award an artificial amount to TBD claimants without proof of rust damage. He feels that such a procedure would result in a windfall for claimants experiencing no damage and, conversely, would dilute distribution to claimants who have actual damage. He concludes that it is in the best interest of all warranty claimants with liquidated claims that the cut-off date be set five to nine years after the last warranty application in 1988. Presumably, a hearing would be set after this cut-off date, at

which time actual damages could be proven.

Beatrice Company agrees with the other interested parties that resolution of the warranty claims should be deferred until conclusion of its litigation. Beatrice cites the following reasons for this conclusion. First, it is appropriate to allow some time to pass in order to permit the warranty claims to mature and become subject to either liquidated damages (if the claimant's vehicle suffered compensable rust damage) or disallowance (if the claimant's vehicle was sold, damaged in a collision, or incurred no rust damage). Second, Beatrice points out, as do other interested parties, that the consequences of its litigation might result in greater assets in the estate being distributed to allowed claimants. Third, Beatrice argues that deciding a warranty claim procedure before conclusion of its litigation would be unfair to it since the company would be required to expend significant time, energy, and resources to make sure that only legitimate claims are allowed. Beatrice points out it must take various safeguards since determination of the warranty claims could have a collateral estoppel effect on the damages issue in its pending litigation. Thus, if this Court decides to proceed with a warranty claim resolution prior to conclusion of the Beatrice litigation, Beatrice suggests that all warranty claimants should be required to provide certain supplemental information and documentation to support their claims.

The points made by Beatrice would seem to persuade toward an early rather than deferred resolution. First, determination here might well simplify the damage issues in the Beatrice litigation. Second, it is by no means unfair to put Beatrice and other objectors to their burden in bankruptcy to object to claims which in this proceeding are presumed valid until objected to. 11 U.S.C. § 502(a) ("a claim ... is deemed allowed, unless a party in interest ... objects"). In bankruptcy, claims are presumed valid and an objector has the burden of establishing a defense *prima facie* before the burden of going forward shifts to claimant. *See In re Allegheny International, Inc.*, 954 F.2d 167, 173–74 (3rd Cir.

1992), and *Matter of Chapman*, 132 B.R. 132, 143 (Bankr.N.D.Ill.1991) (both cases discussing the allocation of burdens in the claims objection process).

Third, if the Beatrice suit is settled, we will still have to resolve the claims here. Alternatively, if that case is not settled, a general jury verdict will certainly not resolve the claims here. Even a jury verdict with special interrogatories following that trial will not resolve the individual claims here. In short, whether before or after that case is over, this Court must decide contested warranty claims in this proceeding.

Memoranda submitted by the Wisconsin Attorney General and Indiana Lumbermens Mutual Insurance Company concern other pending litigation specific to Wisconsin warranty holders. Wis.Stat. § 100.205(6) requires every rustproofing warrantor to purchase a policy of insurance covering financial integrity of its warranties. Rusty Jones purchased a surety bond from Indiana Lumbermens to cover the financial integrity of its rustproofing warranties. That bond was extended in Wisconsin from June 16, 1986 until it ceased doing business. The Attorney General claims that, because the Wisconsin statutory scheme allows the warranty holder a direct action against the bond, Rusty Jones Wisconsin warranty holders with actual rust damage should be allowed to collect directly from the surety, not limited by the face amount of the bond.

Indiana Lumbermens disagrees with the Attorney General's broad application of the Wisconsin statute to Rusty Jones warranty holders. It cites ways in which the Wisconsin claimants might have a valid claim against the debtor, but not against the bond. Indiana Lumbermens also argues that claims litigation would not result in an adequate adjustment of the claims without vehicle inspection and would not lead to an accurate determination of the coverage of the warranty holders. Indiana Lumbermens suggests that this Court wait until the Indiana Lumbermens litigation ends in order to determine the extent of Indiana Lumbermens' liability under the warranty.

Litigation against that insurer is pending before this Court. However, a settlement of that case will shortly be presented for hearing and requested approval on notice thereof. Whether or not that settlement is opposed, the outcome of that litigation will be of no help in resolving disputed warranty claims.

### Issues to Consider in Adopting a Procedure

#### 1. Timing

■ Regardless of which warranty claim procedure is adopted, the timing of implementing that procedure will have no impact on the size of debtor's estate. At present the only asset available for immediate distribution is the $1.4 million in liquid investments. The Beatrice litigation may or may not result in an addition to this fund.

Delay until after conclusion of the Beatrice litigation would definitively fix the amount of money available for distribution to claimants. However, earlier determination of objections to claims need not be followed by distribution until the Beatrice litigation is over. The decision to delay such determination would increase the chance that fewer warranty holders would receive compensation, since more unmatured claims would either become disallowed (because the vehicle was sold, damaged, or suffered no rust damage) or liquidated (because the vehicle suffered compensable rust damage). In short, lengthy delay will quite certainly result in a smaller number of claims and a loss to claimants with bona fide claims who lose or discard records or sell their aging autos and take a loss in such sales because of body rust.

As previously noted, no trial date has yet been set for the Beatrice litigation. Although progress has been made before the District Court, a case of that magnitude and complexity will not likely be tried and appeals therefrom determined for many years to come. Therefore, waiting until completion of the Beatrice litigation would entail a most significant delay as well as unfair treatment to bona fide claimants.

Another option before the Court is to delay implementation of any procedure until 1997 (nine years after the last warranty was issued). The parties seem to agree that rust damage occurs five to nine years after application of rustproofing. Thus a postponement until 1997 would ensure that most of the claimants who suffered rust damage could file a claim for fixed amounts.

However, such delay would cause significant harms which are not justified by the asserted benefit of recognizing only valid liquidated claims.

Delay until 1997, as in the case of delay until the Beatrice litigation is completed, would effectively deny many claimants any recovery at all. A significant number of them will have moved in the interim, and will not be located by the Trustee. *See* L. Long, *Americans on the Move*, American Demographics, June 1990 at 46 (statistical studies generally show that, on average, Americans move once every five to six years). Also, a significant number will have sold their cars. *See* J. Sverina, *Ford Revises Warranty, Buyer Incentives*, United Press International, September 4, 1990; K. Heaney, *View from Wall Street; Profit Seekers Should Take Interest in the Auto Industry in 1990's*, Automotive News, November 29, 1989 at 184 (both articles cite statistical studies showing that Americans keep their cars for about four to seven years). Even if the cars are not sold, only a small percentage of cars are on the road after eight or nine years. Thus, a delay until 1997 will cause most claimants and their cars to disappear from the claimant rolls. Moreover, it has already been several years since these creditors last received notice of this case. Many will have torn up their supporting documents in disgust by now. More will do so if we delay too long, and then objectors who may include Beatrice and the Distributors Committee will likely seek to assert the lack of documentation against them. The claims process in bankruptcy was not intended to be a marathon race in which only those who persevere to the end (by holding necessary papers indefinitely and filing change of address notices over the years) can recover.

Finally, reality carries more weight than theory. Because of the large amount of claims and the relatively small assets available in the estate, or to be available even if there is substantial recovery against Beatrice, the substantial delay suggested would not add more than a few dollars at best to the amount to be paid to each warranty claimant for whom an added few years means a more precise claim to include the latest rust. Any benefit to claimants in delaying until 1997 will be more apparent than real.[2]

## 2. Possible Procedures

One possibility for resolving the warranty claims is to adopt the Trustee's statistical method. This procedure would be to take evidence to determine an average value to all TBD and liquid warranty claims, and then take more precise evidence to evaluate only those claims greater than the average value where specific objections are filed. Claims at or below the average level could be allowed unless objected to and defeated by evidence. One benefit of this procedure would be that it would require little more information than is now available for most claims. The statistical evidence can be presented in a consolidated, severed part of each hearing on claims objected to, on individual notice to claimants.

This statistical method is said by some objectors to provide a theoretical "windfall" to non-legitimate claims at the expense of legitimate warranty holders. However, actual dividends from this estate will at best be nominal to all individual warranty claimants, even if there is a large recovery from Beatrice. (*See* Footnote 2).

It is also feasible to set further dates for hearings only on claims over some designated level that parties in interest object to, after statistical evidence establishes a claim floor, and reduce to that floor the claims of all claimants who do not show up for trial. Valid claims exceeding the amount selected or determined could be allowed either to the statistical average or more to the extent established by individual evidence. The same notice that sets the statistical hearing could set the trial date and inform claimants of the amount that will be allowed if they do not show up.

This procedure could well be efficient, expeditious, and fair. Setting of several trial dates only for the larger claims would effectively limit the number of individual claims evaluated by this Court. Persons could be required to submit notices of intent to appear for trial and copies of paid bills or estimates totaling over the amount exceeding the statistical floor before or at such trial dates. Most claimants who did so would not likely be disputed. By setting such trial dates, long delays in the judicial process of claims resolution would be avoided. Those claimants with the most to gain or the most interest in recovering would likely be the ones to come forward. Claimants who do not have valid claims would not likely bother to bring their claims to trial, and those with small claims (or willing to reduce large claims) would

**2.** A true "windfall" could only occur if funds available in the estate would be large enough to award substantial dividends. If assets in the estate remain at the current level, the supposed "windfall" will be negligible. If the estate wins $30 million from Beatrice to pay, let's say, $150 million in claims, the dividend on a $750 claim will be $30 million, less litigation fees and expenses of perhaps $8 million = $22 million + $1 million in other assets (after payment of administrative expenses) = $23 million ÷ $150 million in claims = 15% dividend × $750 claim = dividend of $112.50. If no recovery comes from the Beatrice suit, the dividend on $1 million in assets (after payment of administrative expenses) ÷ $150 million = .6% dividend × $750 = $4.50. If claims are reduced, the dividends will, of course, increase.

Another mathematical example further illustrates this point. Under the statistical estimate, assume that each warranty claimant has the same damage and receives the same dividend. Dividing each available $1 million into 250,000 claimants results in $4 per claimant. If we posit that half these claimants would receive a "windfall" because they had no rust damage, and if the Court could eliminate all these claimants, then the result would be that each deserving claimant receives $8. Thus, the "windfall" in this example takes an available $4 away from deserving claimants for each $1 million in available net assets. Of course, the expense of individual hearings on inspections to weed out any spurious claims from the quarter million warranty claimants could well eat up available funds.

not have to. Most likely few claimants would appear for trial.

### 3. Claims Estimation

The estimation of TBD and other warranty claims for the purposes of allowance and distribution can be done by statistical means under § 502(c)(1) of the Bankruptcy Code. That provides that, "[t]here shall be estimated for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the estate." 11 U.S.C. § 502(c)(1). Certainly, the warranty claims here must be allowed and liquidated for purposes of distribution in order to avoid delaying final administration of this estate. Thus, estimation of warranty claims is called for.

Section 502(c)(1) does not provide for any particular method of estimating claims. However, it is well established that Bankruptcy Judges should use whatever method is best suited to the particular case contingencies involved. *Matter of Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir.1984); *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3rd Cir.1982); *Matter of Federal Press Company*, 116 B.R. 650, 653 (Bankr.N.D.Ind.1989). *See also* "Procedures for Estimating Contingent Unliquidated Claims in Bankruptcy," 35 Stanford L.Rev. 153–174 (Nov. 1982). The principal consideration of the Court in picking a procedure must be "an accommodation to the underlying purposes of the Code." *Bittner*, 691 F.2d at 135. The Court may estimate the value of warranty claims based on statistics. *See, e.g. Federal Press*, 116 B.R. at 654 (estimating the value of a personal injury plaintiff's claim by referring to the nationwide average jury verdict awarded to personal injury victims with similar injuries).

Thus, this Court may conduct a summary trial to hear and consider statistical evidence for the value of warranty claims, and estimate the value of each claim based on such information derived at trial. The next step would be to estimate all warranty claims in that amount, subject to right of claimants to prove their claims for more than the provisionally estimated amount, and subject to concrete objections to any particular claims.

Moreover, procedures could be adopted to ease the burden of estimating a large number of claims. For example, supplemental information from each warranty holder could be required through interrogatories as a precondition to estimating any claim over the statistically based threshold. The supplemental information would allow interested parties to assess the cost benefits of objecting to warranty claims in excess of the norm, or to contest even the smaller claims if they want to assume that burden.

Such information could be required by way of discovery in a form to be approved by the Court. However, at this late date it may be grossly improper to require much detailed documentation. In bankruptcy, the claim has *prima facie* validity. It is questionable whether objectors can wait long years, as they have here, in the hope that small claimants will discard their records, and then oppose claims for lack of such documents. But to the extent to be found reasonable, some information could be required. The claim might be reduced to the statistical norm if required supplemental information is not provided by a set date.

If a procedure in bankruptcy estimates and then liquidates the amount of all warranty claims, that might be useful in the District Court litigation, if the procedure here puts a cap on possible damages. Estimates of warranty claims here might well assist in fixing the outside limits of those claims so as to limit damage claims before the District Court.

Even if this Court were to delay all work on the warranty claims until after conclusion of the Beatrice litigation, something like the same procedure described above would then be appropriate.

### 4. The Burden of Asserting Claims Objections

■ The obvious disadvantage to seeking supplemental information or doing anything to estimate or otherwise resolve the warranty claims is the cost of any procedure. The act of seeking additional information from many thousands of claimants would require at least one mailing and es-

tablishment of administrative facilities to handle the responses. Such expenses will use up part of the assets currently held in the estate.

However, no party in interest should assume that the estate must bear the entire burden of claims estimation and objections. The foregoing estimation procedure will likely force objecting parties in interest to make cost-effective economic judgments. The Trustee will decide what limit of claim is worth objecting to. Beatrice will decide what resources it wants to invest in claims disputes to keep its potential damages as low as possible in the related District Court litigation. And the distributor creditors will decide how much they want to invest to fight to reduce the claims that compete with their claims for available assets. Such economic judgments will likely reduce the number of objections, since the objectors should bear most expenses relating to their objections.

## CONCLUSION

The $1.4 million on hand must be paid to creditors (after remaining administrative expenses are paid), whether or not the suit against Beatrice is successful, and the claims must be resolved or at least estimated before that can be done. It is appropriate to start that process now, and to delay any resulting distribution until after the Beatrice legislation.

Under these circumstances, the best alternative is to estimate claims for purposes of allowance, liquidation, and distribution under § 502(c)(1). This court will hear statistical evidence and consider estimating all warranty claims at a minimum based on a statistical average amount as may be established by such evidence. This will be subject to increase in the estimate if specifically proved, or decrease if less is claimed or proved by objectors. The "windfall" to any undeserving claimants will be negligible, because each warranty claimant will only receive a few dollars at best. Furthermore, the cost of determining (by individual inspections and claim-by-claim analysis) which individual claimants actually have rust damage would probably exceed the small amount of funds available to pay each claimant. Therefore, statistical evidence will be invaluable in helping the Court to estimate claims disputes efficiently. A fair estimation will enable distribution of estate funds, so that the case may close after the Beatrice suit is over.

It is high time that parties in interest decide what claims they want to object to, since most auto rust appears in five years and all warranty claims will be at least that old next year. Moreover, they are free to object to TBD claims over a set amount, or to take on the burden of objecting to all such claims. In the light of limited estate assets and small dollars to be recovered by warranty claimants under any realistic scenario, it is not unfair to require the TBD claimants to participate in the contemplated estimation procedure, even if they do not know the full extent of their rust damage. TBD claimants could fairly be required to be estimated by statistical averaging methods, unless they file and establish larger damages.

By separate order, the Trustee and all parties in interest are given a fixed date by which to file objections to all warranty claims, and a status date is set to fix procedures and timing for preparation and estimation hearings on these disputed claims. The Court will establish procedures leading to final estimation of all warranty claims that are objected to.