### In re HYDROX CHEMICAL COMPANY, Debtor.

### Bankruptcy No. 95 B 06375.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 10, 1996.

---

Abraham Brustein, Smith Williams & Lodge, Chicago, IL, Richard H. Fimoff, Harold L. Moskowitz, Robbins Salomon & Patt, Chicago, IL, for Debtor.

Joseph Cohen, Gina Krol, Cohen & Krol, Chicago, IL, Trustee.

Kathryn E. Korn, Di Leonardi & Broihier, Des Plaines, IL, for DiLeonardi & Broihier, Ltd.

Philip W. Sandler, Chicago, IL.

Keevan D. Morgan, Morgan & Bley, Chicago, IL, for Progressive Plastic, Inc.

Dean Harvalis, Diane L. Graham, Office of the U.S. Trustee, Chicago, IL.

Chester Foster, Foster & Kallen, Chicago, IL, for Kappana Ramanandan.

Eugene Crane, Dannen Crane Heyman & Simon, Chicago, IL.

Michael Weininger, Katz Randall & Weinberg, Chicago, IL.

Kevin M. Brill, Chicago, IL, for Guy Srivastiva.

### *MEMORANDUM OPINION ON TEMPORARY ALLOWANCE OF RICO CLAIMS UNDER RULE 3018(A) FOR VOTING*

JACK B. SCHMETTERER, Bankruptcy Judge.

#### *Introduction*

On March 31, 1995, three creditors, including Hatley Sales Corp. and Label–Tek, Inc., filed an involuntary petition against Hydrox Chemical Company, Inc. ("Hydrox" or "Debtor"), producer of health care supplies. Subsequently, American Packaging Products, Inc., Coleman Chemical Company, J.R. Glass & Associates, Poly–Seal Corp., and Progressive Plastics, Inc. joined the petition. (collectively "RICO Claimants"). Debtor consented to an order for relief under Chapter 11 of the Bankruptcy Code. On July 13, 1995, a Chapter 11 trustee was ordered to be appointed.

Hydrox operated its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 until a Plan was confirmed. Certain creditors filed claims based upon an alleged scheme perpetrated by the CEO of the debtor, Guyan Srivastiva ("Guy Sri"), in violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq.* Debtor filed objections to each of the RICO claims.

Two competing plans of reorganization were filed, one by Guy Sri on behalf of Hydrox and its majority shareholders, and one by Ram, who is a minority shareholder of Debtor. The two Plans and a joint Disclosure Statement were distributed to all the creditors of this estate, who were solicited to vote for either Plan.

The disputing parties entered into an Agreed Order Regarding Estimation of Certain Claims for Voting Purposes ("Agreed Order"), fixing timing and procedures for Ballots to be cast in connection with these competing plans.

Pursuant to the provisions of 11 U.S.C. § 502(c) and Bankruptcy Rule 3018(a), the Agreed Order described the procedure to be followed to aid the Court in estimating creditors' pending RICO claims. It provided for filing of detailed claims objections and detailed pleadings of the RICO claims, each supported by documentation, affidavits, depositions, and briefs. The Agreed Order further provided that, upon receipt of submissions from both sides, the RICO claims would be estimated by the Court solely for the purpose of fixing the right of creditors to vote on the competing plans. Such estimation was to be without prejudice to actual litigation of the estimated claims.

Following review of documentation submitted by the parties, for the following reasons the RICO claims were found by prior order to be given a two-thirds chance of success, and therefore each such claim was estimated and temporarily allowed for voting purposes at two-thirds of the amount claimed, that is at twice the amount of damages instead of three times damages as provided in the RICO statute.

## FACTS ASSERTED FOR PURPOSES OF CLAIMS ESTIMATION

On May 15, 1995, RICO claimants filed proofs of claim for cash-on-delivery goods shipped interstate to Hydrox, that were paid with checks drawn on insufficient funds. Together with their claims, the RICO claimants submitted copies of bad checks that were sent as payment or replacement checks for orders made by the debtor.

The RICO claimants claim that Debtor, through Guy Sri, used the United States Postal Service and interstate phone calls in violation of 18 U.S.C. § 1341 and § 1343 to fraudulently induce suppliers to deliver goods and cash on delivery orders. It is asserted that Debtor made specific representations that the RICO claimants would be paid by check for delivery of goods and services. It is alleged that the purpose of the scheme was to defraud the RICO claimants and induce them to make deliveries of goods for which the Debtor and Guy knew payment would never be made, and/or for which they never intended to make payment.

The RICO claims relied on an affidavit submitted by Mr. Molloy, Hydrox's accountant, who described the alleged RICO scheme that Guy Sri had instructed Molloy to follow in February and March, 1994. Allegedly, Hydrox, through Guy, negotiated payment terms with creditors for payment within 45–60 days. Hydrox then would ignore the agreed payment terms and not consider payment before 75 days from the date of invoice. Allegedly, Debtor's personnel were instructed by Guy to try to hold out from paying for at least 90 days. At 90–100 days from date of invoice, if the creditor was pressuring payment, a check was to be written to the customer. Because of the Debtor's large overdrafts averaging daily up to $30,000 at Amcore Bank, and up to $160,000 at the State Bank of India, it was likely that any check actually written was not covered by sufficient funds.

Allegedly, in order to gain time, Hydrox awaited customer notification of this insufficiency before any action was taken. The RICO claimants alleged that another delay tactic was for Debtor's employees to inform creditors to redeposit these non sufficient fund checks ("NSF checks"). If the redeposited check also did not clear, Debtor's employees were to issue a replacement check or to obtain a cashier's check for the customer up to a week later. At times, even these replacement checks were issued on accounts with insufficient funds. Furthermore, after negotiating a promissory note with Progressive Plastics to take care of some of these

bad checks, the first payment on that note was also made with an NSF check.

At a deposition, Guy testified that he personally signed 90–95% of these checks in day-to-day operations when he was not on vacation. Ram signed them in his absence. Guy Sri dep. p. 21. Guy Sri also testified that he wrote checks from one overdrawn bank account to another, even though he had no agreement with any bank to pay the overdrafts. Guy Sri dep. p. 14, 19, 20, 31. Amcore, Citibank, and State Bank of India were all used as drawee banks. Molloy's affidavit stated that, by the time the bankruptcy petition was filed, the overdraft amounts had grown to $403,000, and accounts payable to trade vendors amounted to $1,157,964.40 with only 3.28% of this sum being current.

When Guy Sri had personally withdrawn funds from Hydrox in December 1994, causing a shortage of working capital, Efrain O'Campo, the plant manager, loaned the debtor $100,000 to meet payroll expenses. Guy Sri repaid O'Campo with a Hydrox check, that also proved to be drawn on insufficient funds, and O'Campo filed a claim against Debtor.

Proceeds from the sale of products produced from these shipped goods, amounting to approximately $850,230, were transferred to Guy, to Neil Srivastiva (Guy's son), to Madouv, and to Nigam Srivastiva (Guy's brothers), and to three insider companies owned/controlled by Guy (Global, Prima–Tek, and Equine Industries, Ltd.) for little or no consideration at least one year prior to filing of the petition. Molloy Affidavit, Guy Sri Dep. p. 73. From December 1993 onward, Guy also deposited company checks into a First Chicago personal account totaling approximately $100,000 to be wire transferred to another account in India. Molloy Affidavit. In effect, the creditors allege that Guy Sri used Hydrox as his instrumentality to profit for himself, his wife, and their insider companies at the expense of its suppliers and creditors.

Debtor has asserted that all creditors knew and understood that it was probable that the Debtor would not pay on time and acquiesced to the arrangement, thereby eliminating any fraudulent intent or involvement by Guy Sri. Reply p. 5. Furthermore, Debtor argues that the creditors have failed to meet any of the elements required under the RICO statute, in particular pattern, fraud, duration, and causal nexus. Reply p. 13.

Evidence tends to show, subject to actual trial of the claims and final liquidation thereof in the District Court, that the RICO claimants could prove by a preponderance of evidence the elements of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a) and (c). For purposes of this claim estimation, the claimants produced documents and testimony which show that Guy Sri perpetrated a pattern of racketeering activity through Hydrox to defraud its creditor and suppliers for personal gain. Consequently, for reasons stated herein, their claims were found to be strong and were estimated to have a two-thirds chance of success.

## DISCUSSION

### Standards

 The temporary allowance of a claim for voting purposes is committed to this Court's reasonable discretion based on Fed. R.Bankr.P. 3018(a), which provides in relevant part that:

> ... notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.

Section 502(c)(1) of the Bankruptcy Code provides that there shall be estimated for purpose of allowance "... any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the estate." Neither Rule 3018(a) nor § 502(c)(1) provide any particular method of estimating claims. However, Bankruptcy Judges should use whatever method is best suited to the particular case contingencies involved. *See In re Rusty Jones, Inc.*, 143 B.R. 499, 505 (Bankr.N.D.Ill.1992).

## RICO

The issue here was to determine the probability that Claimants can successfully recover under the RICO statute.

The RICO statute, 18 U.S.C. § 1962(c), states in relevant part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

■ To establish a violation of RICO, it is necessary to demonstrate: (1) that there be an enterprise affecting interstate commerce, (2) that defendant was employed by or associated with the enterprise, (3) that defendant participated, either directly or indirectly, in conduct or affairs of the enterprise, and (4) that he participated through a pattern of racketeering activity. *McDonald v. Schencker*, 18 F.3d 491 (7th Cir.1994). In this case, prongs (1) and (2) were easily satisfied, as Hydrox shipped supplies across state borders and Guy was the CEO of Hydrox. The difficult part of the dispute was whether the acts engaged in were "racketeering" activity and whether the acts constituted a pattern.

### Predicate Acts

■ To prove a pattern of racketeering activity, the claimants must show at least two related predicate acts that amount to, or threaten the likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Company*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The conduct in question must itself be subject to criminal sanction. *Koulouris v. Estate of Chalmers*, 790 F.Supp. 1372 (N.D.Illinois 1992). In order to meet this requirement, claimants alleged violations of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). *See Dudley Enterprises, Inc. v. Palmer Corp.*, 832 F.Supp. 221 (N.D.Ill.1993) (finding that mail and wire fraud may form basis of RICO claim). *See also Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1274 (7th Cir.1989) (finding wire fraud committed over a four-month period constituted a pattern of racketeering activity).

■ In order to allege mail fraud under RICO, it is not a requirement that material mailed be itself fraudulent or even misleading; rather, mailing must be in furtherance of a scheme to defraud. *Richardson Greenshields Securities Inc. v. Lau*, 819 F.Supp. 1246 (S.D.N.Y.1993). In this case, Guy continuously wrote bad checks in order to cover debts which Claimants say were never intended to be repaid. Furthermore, Guy drained Debtor's estate at the expense of creditors for personal gain. Together these activities, which used the mails and telephones for the asserted purpose of defrauding creditors, constitute predicate acts as required by RICO.

### Pattern

■ With the predicate act requirement satisfied, the claimants must establish a pattern. To establish a pattern, the plaintiff in a RICO case must prove continued criminal activity or a threat of continued activity (the continuity element), and a relationship between the predicate acts (the relationship element). *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). This "continuity plus relationship" test was adopted by the Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). To prove a pattern of racketeering, a plaintiff must show (1) relatedness of the predicate acts and (2) continuity. 18 U.S.C.A. § 1961(5).

The Court in *Northwestern Bell* pointed out that:

[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.

*Id.* at 241, 109 S.Ct. at 2901.

. . . . .

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few

weeks or months and threatening no future criminal conduct do not satisfy this requirement. *Id.* at 242, 109 S.Ct. at 2902.

The Supreme Court also stated that alternatively a party may prove a pattern of racketeering activity by showing a specific threat of repetition extending indefinitely into the future or that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. *Id.*

### Relatedness

■■■ Relationship implies that predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct. *J.D. Marshall International, Inc. v. Redstart,* 935 F.2d 815, 819 (7th Cir.1991). The relatedness requirement was fulfilled here.

### Continuity

■■■ Courts in this Circuit have understood the ruling in *Northwestern Bell* to define two types of continuity, closed-end and open-end. As its label suggests, a "closed-ended" period of racketeering activity involves a course of criminal conduct which has naturally come to a close. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1022 (7th Cir.1992) *citing Northwestern Bell,* 492 U.S. at 241, 109 S.Ct. at 2901. To satisfy the continuity element in a closed-ended case, the plaintiff must prove a series of related predicate acts during a "substantial period of time." *Id.*

■■■ An open-ended period of racketeering, by contrast, is a course of criminal activity which lacks the duration and repetition to establish continuity. *Midwest Grinding,* 976 F.2d at 1022. However, a RICO plaintiff may still satisfy the continuity requirement in that situation by showing conduct which by its nature projects into the future with a threat of repetition. *Northwestern Bell,* 492 U.S. at 242, 109 S.Ct. at 2902. Such a threat of continuity exists when the plaintiff can show (1) a specific threat of repetition, (2) that the predicate acts or offenses are part of an ongoing enti-

ty's regular way of doing business, or (3) that the defendant operates a long-term association that exists for criminal purposes. *Northwestern Bell,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03. In sum, a RICO plaintiff can fulfill the continuity prong by either (1) demonstrating a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future. *Midwest Grinding,* 976 F.2d 1016, 1022 (7th Cir.1992).

In this Circuit, the Court of Appeals has formulated different tests for closed-end continuity and for open-end continuity. *See Vicom Inc. v. Harbridge Merchant Services* 20 F.3d 771 (7th Cir.1994) (finding that there are two different standards for closed or open-ended continuity). The main difference in the Seventh Circuit is that the duration element, which in this case is highly contested, is more relevant and has to be longer in the context of close-ended continuity.

### Closed Ended Continuity—Duration Element not Fulfilled

■■■ If the instant case were to be considered under the closed-ended standard, then the RICO Claimants have not proven or even pleaded a long enough period of predicate acts to show continuity and therefore a pattern. In *Midwest Grinding v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992), the Court failed to find a pattern where the predicate acts behind the closed-ended period of racketeering activity went on for only nine months. Moreover, in *Uni–Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 922 (7th Cir.1992), the Court concluded that, subsequent to *Northwestern Bell,* a scheme that lasted at most seven to eight months was precisely the type of short-term, closed ended fraud that the Seventh Circuit has held not to meet the duration element of the pattern prong. In another closed-end continuity case, the Court again found that six months was too short a period of time. *Olive Can,* 906 F.2d at 1151.

In this case, the Claimants have pleaded that Guy's alleged acts took place over at least six months. However, most of the exhibits they submitted to support this claim

show that the majority of bad checks were issued within a six month period prior to filing bankruptcy. The proof as to any checks written on insufficient funds outside the six month period is sparse. In light of the cited authority of this Circuit and the finding that the period of predicate acts demonstrated in this case was only six months, it must be concluded that Claimants did not demonstrate a period of repeated conduct long enough to constitute a closed-ended pattern of continuity.

### Open–Ended Continuity—Definition

Continuity as an open-ended concept refers to past conduct that by its nature projects into the future with a threat of repetition. *Vicom* 20 F.3d at 782 *citing Northwestern Bell,* 492 U.S. at 241, 109 S.Ct. at 2901. As such, the durational element is not as pertinent to the open-ended continuity analysis. *Midwest Grinding,* 976 F.2d at 1023. Instead, open ended continuity is present when (1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. *Northwestern Bell,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03; *see also Midwest Grinding,* 976 F.2d at 1023.

### Scheme Here Was Open–Ended

█ In this Circuit, several cases have been decided wherein the pivotal issue was whether the scheme alleged was closed or open-ended.

The leading cases in this Circuit where trade creditors were assertedly defrauded by a corporation and its officers through various schemes were *Olive Can Inc. v. Martin,* 906 F.2d 1147 (7th Cir.1990); *Uni\*Quality v. Infotronx,* 974 F.2d 918 (7th Cir.1992); and *Ashland Oil Inc. v. Arnett,* 875 F.2d 1271 (7th Cir.1989).

In *Olive Can Co., Inc. v. Martin,* the president and CEO of a debtor created a new company for the purpose of diverting money from the debtor. 906 F.2d 1147 (7th Cir. 1990). The debtor was over leveraged and all of its assets were covered by the bank's blanket lien. The officer created the new company to buy debtor's inventory and lent money to the new company ($550,000), which in turn gave the officer a security interest in its assets. Even though the cash flow was meager, the debtor only selectively paid back the officer's loan. The bank filed an involuntary petition for bankruptcy against the debtor and a RICO action against the CEO. The court found the scheme to be a closed-ended scheme, primarily basing its decision on the undisputed evidence that the purpose of the allegedly fraudulent scheme was to pay the officer's loan. The opinion therefore concluded that the scheme had a natural ending with no threat of continued criminal activity. *Id.* at 1150.

In *Uni\*Quality v. Infotronx,* 974 F.2d 918 (7th Cir.1992), Infotronx hired Uni\*Quality to provide computer programmers for a software labor scheduling program that Infotronx intended to develop. While Infotronx succeeded in developing the program, it never paid Uni\*Quality for its programmer services. Subsequently, Uni\*Quality filed a RICO suit, alleging that Infotronx had always intended to defraud it. The opinion found that Infotronx had engaged in a closed-ended scheme, but that such a scheme did not constitute a pattern because it lasted at most eight months. The main reason the scheme was closed-ended was because the alleged fraud was found to have been perpetrated only to secure Uni\*Quality's services for the labor scheduling program. Once the labor demands for the program ended, so would the alleged fraudulent scheme against Uni\*Quality and several other companies.

In *Ashland Oil v. Arnett,* 875 F.2d 1271 (7th Cir.1989), however, the opinion found an open-ended continuity scheme in a case very much like the one before this Court. In *Ashland Oil,* an officer of the debtor, together with the debtor, allegedly tried to defraud its trade creditors. Oil suppliers brought a RICO suit against a distributor's officers, who gave false financial information to three oil companies to induce the oil companies to extend credit and deliver product to the distributor. Officers of the debtor-distributor received about $1 million in oil products with-

out ever intending to pay for them. Four trade creditors, oil companies in that case, filed an involuntary petition against the debtor-distributor. At the time of the petition, the debtor-distributor had no oil and very few assets remaining.

In direct parallel to the present case, in *Ashland Oil* there was evidence that the debtor diverted funds to its officers and the companies owned by them. In the case at bar, a pattern of racketeering activity has been presented that is analogous to that found in *Ashland Oil.* This case involves the same factors—multiple victims and a variety of predicate acts used in defrauding business creditors, even though the predicate acts only took place over a short period of time (four months in *Ashland Oil* and six months here). The court in *Vicom, Inc.,* 20 F.3d at 779, n. 9 (7th Cir.1994), opined that *Ashland Oil* was a case of open-ended continuity, regardless of the short duration of the acts, because the threat existed that the wrongful acts would continue.

An open-ended scheme has been demonstrated in this case that is similar to *Ashland Oil.* Debtor's principal did not merely write some bad checks, a practice which some businesses may practice occasionally when their cash flow dries up. Guy, like the officers in *Ashland Oil,* diverted funds away from Debtor for personal use. In effect, the Debtor was systematically used by Guy to provide misinformation in order to obtain credit from trade creditors as part of a scheme to divert large sums of money out of the Debtor into Guy's control.

Therefore, it can be concluded that the pattern requirement has been fulfilled in this case.

### *The Multi–Factor Test—Not Applicable*

 Debtor urged application of the multi-factor test devised by this Circuit for assessing whether a pattern has been established under RICO. Indeed, this Circuit has enunciated in *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986), a multi-factor test to determine whether a pattern of racketeering has been proven by the plaintiffs. These factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Morgan v. Bank of Waukegan,* 804 F.2d at 975.[1]

The opinion in *Vicom, Inc. v. Harbridge Merchant Services Inc.,* 20 F.3d 771, 780–82 (7th Cir.1994), expressly limited the multi-factor test to closed-ended continuity. Because open-ended continuity has been found here, this test cannot be applied.

### *Debtor's Liability for the Acts of its CEO*

 The Debtor cannot be held liable under 18 U.S.C. § 1962(c), but can be held liable under 18 U.S.C. § 1962(a) and (b).[2] The language of subsection (c) has been read to proscribe vicarious liability of a corporation under RICO for the racketeering acts of its officers. *Haroco v. American Nat. Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984); *Parnes v. Heinold Commodities, Inc.,* 548 F.Supp. 20, 23–24 (N.D.Ill.1984). However, so long as the corporation has de-

---

1. While the test largely follows the language of *Northwestern Bell* in which the Supreme Court clarified the pattern requirement, its continued viability has been questioned by at least one Court of Appeals. *See Fleet Credit Corp. v. Sion,* 893 F.2d 441, 445–47 (1st Cir.1990); *but see Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 779 (7th Cir.1994) (finding that the language in *Morgan* is still viable after *Northwestern Bell*); *Olive Can Co., Inc. v. Martin,* 906 F.2d 1147 (7th Cir.1990) (same).

2. 18 U.S.C. § 1962(a) states in part:
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in

which such a person has participated as a principal within the meaning of section 2, title 18, United States Code, **to use or invest,** in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
(Emphasis supplied.)
 18 U.S.C. § 1962(b) states:
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

rived a benefit from the violation, holding the corporation liable under *respondeat superior* may be entirely appropriate. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987).

■ The reasoning behind not holding corporations liable under § 1962(c) is that the language of § 1962(c) only finds the "person" perpetrating the racketeering liable, and its language also implies that the enterprise be construed as a separate entity from the person committing the racketeering activity. *Haroco*, 747 F.2d at 401; *Liquid Air Corp.*, 834 F.2d at 1306. However, courts in this Circuit have found that the language of § 1962(a) and (b) allow for corporate liability for the acts of its officers. *See Haroco*, 747 F.2d 384 (under subsection (a), the party liable may be a corporation using the proceeds of a pattern of racketeering activity in its operations); *Liquid Air Corp.*, 834 F.2d at 1305 (same for § 1962(b)). The liability under both § 1962(a) and (c) is direct liability rather than liability under *respondeat superior*. *See R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499, 1521 (N.D.Ill.1990) *citing D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 968 (7th Cir.1988). Therefore, when high level corporate directors, officials or employees engage in a pattern of racketeering under § 1962(a), it can be found that such corruption has the imprimatur of corporate policy. *R.E. Davis Chemical Corp.*, 757 F.Supp. at 1521.

■ However, before a corporation is held liable for the racketeering acts of its officers, it must be established that the corporation has benefited from the racketeering scheme. *Liquid Air Corp.*, 834 F.2d at 1305; *Dynabest Inc. v. Yao*, 760 F.Supp. 704, 711 (N.D.Ill.1991). In *Liquid Air*, it was held that the corporation-enterprise is liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. *Haroco*, 747 F.2d at 402. In this case, the Debtor benefited for a time by receiving revenues from supplies provided by creditors that were never paid. Therefore, the claims for treble RICO damages against the Debtor can be sought under § 1962(a).

## CONCLUSION

The Debtor argued that, if a RICO suit based on Guy's alleged conduct is found viable, such ruling would set a precedent that common behavior of writing bad checks for a financially distressed corporation is enough to sustain a RICO lawsuit. This argument missed the point. It failed to distinguish between a debtor operating in distress, where a few NSF checks may be issued, and the behavior demonstrated here. Many NSF checks were issued by the Debtor as a regular practice, knowing that there was no possibility of those checks being honored. Moreover, the scheme was used to enable large funds to be diverted out of the Debtor's accounts for private and personal benefit. Companies in financial distress generally do not engage in such fraudulent conduct.

■ Because Claimants can present a strong evidentiary case, and one that is legally viable, it is estimated under Fed. R.Bankr.P. 3018(a) that the RICO claims will have a two-thirds probability of success. The inquiry as to whether a pattern under RICO can be established is necessarily less than precise. As the Supreme Court stated in *Northwestern Bell:*

> The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern or racketeering activity" exists.

492 U.S. at 240, 109 S.Ct. at 2902.

Such uncertainty means, of course, that there remains some possibility that Claimants would ultimately fail despite their strong showing for the present limited purpose and analysis. Therefore, only two-thirds of each claim was temporarily allowed and counted for voting at the confirmation hearing.

This was the result: 100% of the base claims of RICO claimants for actual damages was allowed for voting purposes related to the confirmation hearing. Because a successful RICO action warrants treble dam-

ages, but only two-thirds of each claim was estimated and temporarily allowed for voting purposes, claims of each said claimant were doubled for voting purposes rather than trebled.